UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

| | | |
|---|---|---|
| BRIDGET MARY O'DONNELL, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:13-cv-436 |
| | ) | |
| v. | ) | Honorable Gordon J. Quist |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |
| _____ | ) | |

This is a social security action brought under 42 U.S.C. § 405(g) seeking review of a final

decision of the Commissioner of Social Security denying plaintiff's application for disability

insurance benefits (DIB).  On February 2, 2010, plaintiff filed her application for benefits.  (Page

ID 169-75).  She claimed an August 14, 2009, onset of disability.  (Page ID 169).  Her claim was

denied on initial review.  (Page ID 101-14).  On November 14, 2011, plaintiff received a hearing

before an administrative law judge (ALJ), at which she was represented by counsel.  (Page ID 55-

99).  On January 3, 2012, the ALJ issued her decision finding that plaintiff was not disabled.  (Page

ID 36- 49).  On March 11, 2013, the Appeals Council denied review (Page ID 25-27), and the ALJ's

decision became the Commissioner's final decision.

Plaintiff filed a complaint seeking judicial review of the Commissioner's decision.  She asks

the court to overturn the Commissioner's decision on the following grounds:

1.  The ALJ "gave no valid reasons" for rejecting plaintiff's reported symptoms and
     limitations; and

2.  The ALJ violated the treating physician rule.

(Plf. Brief at 2, Statement of Errors, docket # 14, Page ID 894).   I recommend that the Commissioner's decision be affirmed.

## **Standard of Review**

When reviewing the grant or denial of social security benefits, this court is to determine whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner correctly applied the law.  *See Elam ex rel. Golay v. Commissioner*, 348 F.3d 124, 125 (6th Cir. 2003); *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001).  Substantial evidence is defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Heston v. Commissioner*, 245 F.3d 528, 534 (6th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see Rogers v. Commissioner*, 486 F.3d 234, 241 (6th Cir. 2007). The scope of the court's review is limited.  *Buxton*, 246 F.3d at 772.  The court does not review the evidence *de novo*, resolve conflicts in evidence, or make credibility determinations.  *See Ulman v. Commissioner*, 693 F.3d 709, 713 (6th Cir. 2012); *Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997).  "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . . ."  42 U.S.C. § 405(g); *see McClanahan v. Commissioner*, 474 F.3d 830, 833 (6th Cir. 2006). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  . . .  This is so because there is a 'zone of choice' within which the Commissioner can act without fear of court interference."   *Buxton*, 246 F.3d at 772-73.   "If supported by substantial evidence, the [Commissioner's] determination must stand regardless of whether the reviewing court would resolve the issues of fact in dispute differently."  *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *see Gayheart v. Commissioner*, 710 F.3d 365, 374 (6th Cir. 2013)("A reviewing court will affirm the

Commissioner's decision if it is based on substantial evidence, even if substantial evidence would have supported the opposite conclusion.").  "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Commissioner*, 336 F.3d 469, 477 (6th Cir. 2003); *see Kyle v. Commissioner*, 609 F.3d 847, 854 (6th Cir. 2010).

## Discussion

The ALJ found that plaintiff met the disability insured status requirements of the Social Security Act on August 14, 2009, through the date of the ALJ's decision.  (Op. at 3, Page ID 38).  Plaintiff had not engaged in substantial gainful activity on after August 14, 2009.  (*Id.*).  Plaintiff had the following severe impairments:  status post cervical fusion (2003), chronic fatigue syndrome, hypermobility of joints, headaches, chronic venous insufficiency, non-inflammatory osteoarthritis, history of Raynaud's, depression, and generalized anxiety disorder.  (*Id.*).  Plaintiff did not have an impairment or combination of impairments which met or equaled the requirements of the listing of impairments.  (*Id.* at 4, Page ID 39).  The ALJ found that plaintiff  retained the residual functional capacity (RFC) for a limited range of light work:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with the following limitations:  lifting 20 pounds occasionally and 10 pounds frequently; standing and walking 6 hours and sitting 6 hours in an eight hour workday; no climbing ladders, ropes or scaffolds, less than frequent stooping and crouching; frequent climbing ramps and stairs; frequent balancing, kneeling and crawling; she should avoid concentrated exposure to extremes of cold; she can understand, remember and perform simple instructions and make simple work related decisions; she can interact with coworkers, supervisors and the public; and she should avoid even moderate exposure to hazards, such as unprotected heights and dangerous moving machinery.

(Op. at 6, Page ID 41).  The ALJ found that plaintiff's testimony regarding her subjective functional limitations was not fully credible:

> Claimant testified that she had earned 60-75 online college credits since June of 2010.  She testified she was working towards a business communications degree.  She testified that she read textbooks, participated in the online discussion boards and wrote papers.  She testified she could read, write and perform simple math, although it took her longer to make change.  She testified she was receiving unemployment.  She testified she left her last employment after she was laid off.  Claimant testified she had pain and impenetrable fatigue.  She testified that when working on her laptop she had to sit with pillows behind her neck and low back, she had to have her feet up and she had to be stationary.  In addition, she testified she required a neck collar because moving her arms, even just to reach an object, could cause her neck to dislocate.  She testified that she loaded the dishwasher, but could not vacuum, she only dusted occasionally and she could only make it to her mailbox a few times per week.  She testified that Flexeril made her drowsy and Neurontin made her cry.  She alleged she could not process mentally as she used to.  She testified she did not take any pain medication prior to the hearing.

> Claimant is simply not credible.  During her testimony, she presented as smiling and she gesticulated wildly.  She talked with her arms extensively, moving them overhead, out to the side, and in front of her.  Thus, her presentation was inconsistent with her testimony that she has to sit with pillows, her feet up and her neck collar on, because reaching might dislocate her neck.  Furthermore, the claimant did not take any pain medication before the hearing.  When the claimant was asked at the hearing about this inconsistency, she stated only that she was nervous and that was why she was moving her arms.  Moreover, the claimant's testimony and subjective allegations are inconsistent with the objective medical evidence.  Although claimant testified she was impenetrably fatigued and suffered from cognitive problems, she has managed to live alone, care for her own personal needs, handle her own finances, shop, do chores and obtain 65-70 online college credits since her alleged onset date (Exhibit 5E and testimony).  Moreover, the claimant left her last position because she was laid off and she has received unemployment compensation.

> In addition, claimant's objective medical evidence indicates her exams have been mostly normal.  She has minimal clinical findings.  The only imaging of her neck since the alleged onset date was an x-ray that was essentially normal, and none of her physicians have felt she needed an MRI, CT or other advanced imaging.  Furthermore, no physician has felt that her cognitive functioning was so declined that she required neuropsychiatric testing.  Moreover, despite her allegations of pain, her physicians repeatedly note that she appears in no distress.  As a result, after careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

* * *

[T]he objective medical evidence documents claimant has marginal clinical findings. Her radiology findings indicate a history of cervical fusion. The only significant objective clinical findings are some tenderness, muscle spasms, Heberden's nodes and some increased range of motion in her joints. In addition, there is minimal mention of Raynaud's and minimal complaints of frequent headaches. Therefore, the objective medical evidence documents the claimant's ability to perform light exertion work with reduced postural movements, limited exposure to cold and avoidance of hazards as described above. These limitations would fully accommodate her status post cervical fusion, hypermobility of joints, headaches, non-inflammatory osteoarthritis and history of Raynaud's.

In terms of claimant's depression and anxiety, the record documents minimal and conservative treatment. In 2007 claimant was diagnosed with an adjustment disorder and depressed mood (Exhibit 4F at 33). She received some therapy intermittently through October 2010 (Exhibit 21F at 1). Additionally, during this time her primary care records indicate that she was prescribed typical antidepressants (Exhibit 5F and 9F). There was minimal mention of any psychiatric problems at her treating provider visits, and other than medication prescribed by her primary care physician, she received no psychiatric treatment after October 2010.

* * *

Therefore, the records document that claimant had some therapy from 2007 through October 2010. Since October 2010, the only treatment she has received is medication from her primary care provider. There is no evidence that claimant has required any crisis intervention, inpatient hospitalizations, emergency room visits or any other increases in treatment. Furthermore, at the consultative examination, claimant was able to perform simple math calculations and she was somatically preoccupied. As a result, the above limitations for understanding, remembering and performing simple instructions and making simple work related decisions would fully accommodate her conservatively treated depression and anxiety.

* * *

In sum, the above residual functional capacity assessment is supported by the lack of objective evidence, her conservative psychiatric treatment, her inconsistent presentation and testimony, her reported ability to live alone and attend college, and her reports that medications were effective.

(*Id.* at 6-12, Page ID 41-47). The ALJ found that plaintiff was not able to perform any past relevant work. (*Id.* at 12, Page ID 47). Plaintiff was 46 years old as of her alleged onset of disability and 48 years old as of the date of the ALJ's decision. Thus, at all times relevant to her claim for benefits she was classified as a younger individual. (*Id.*). Plaintiff has at least a high school education and is able to communicate in English. (*Id.*). The ALJ found that the transferability of job skills was

not material to a disability determination.  (*Id.*).  The ALJ then turned to the testimony of a vocational expert (VE).  In response to a hypothetical question regarding a person of plaintiff's age, and with her RFC, education, and work experience, the VE testified that there were approximately 29,000 jobs in Michigan that the hypothetical person would be capable of performing.  (Op. at 13, Page ID 48; *see* Page ID 94-95).  The ALJ found that this constituted a significant number of jobs. Using Rule 202.21 of the Medical-Vocational Guidelines as a framework, the ALJ held that plaintiff was not disabled.  (Op. at 13-14, Page ID 47-48).

## 1.

Plaintiff argues that the Commissioner's decision should be overturned because the ALJ "gave no valid reasons" to reject her reported symptoms and limitations.  (Plf. Brief at 7-14, Page ID 899-906; Reply Brief at 2-4, Page ID 998-1000).  Specifically, plaintiff argues that the ALJ applied a version of the "sit and squirm" test and "played doctor" when she found that plaintiff's extensive hand movements during the hearing undercut her testimony claiming significant restrictions in her ability to move because movement might cause her neck to dislocate.  She claims that the ALJ gave inappropriate consideration to plaintiff's daily activities.  She argues that the ALJ committed error when she considered that plaintiff stopped working when she was laid off and that she continued to collect unemployment.  She also claims error in the ALJ's observations that the objective medical findings were minimal, that there had been minimal psychological treatment and no neuropsychiatric testing, that doctors noted that plaintiff was in "no acute distress," that plaintiff's headache complaints had been rare.  She claims that the ALJ "cherry picked" the record because she observed that plaintiff had refused to take pain medications because they caused weight gain and failed to note the dozens of instances where plaintiff took prescribed medications over an

extended period of time. None of plaintiff's arguments attacking the ALJ's factual finding regarding her credibility provide a basis for disturbing the Commissioner's decision.

Credibility determinations concerning a claimant's subjective complaints are peculiarly within the province of the ALJ. *See Gooch v. Secretary of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987). The court does not make its own credibility determinations. *See Walters v. Commissioner*, 127 F.3d at 528. The court's "review of a decision of the Commissioner of Social Security, made through an administrative law judge, is extremely circumscribed . . . ." *Kuhn v. Commissioner*, 124 F. App'x 943, 945 (6th Cir. 2005). The Commissioner's determination regarding the credibility of a claimant's subjective complaints is reviewed under the "substantial evidence" standard. This is a "highly deferential standard of review." *Ulman v. Commissioner*, 693 F.3d 709, 714 (6th Cir. 2012); *see also Strevy v. Commissioner*, No. 1:12-cv-634, 2013 WL 5442803, at * 2 (W.D. Mich. Sept. 30, 2013). "Claimants challenging the ALJ's credibility determination face an uphill battle." *Daniels v. Commissioner*, 152 F. App'x 485, 488 (6th Cir. 2005). "Upon review, [the court must] accord to the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [the court] d[oes] not, of observing a witness's demeanor while testifying." *Jones*, 336 F.3d at 476. "The ALJ's findings as to a claimant's credibility are entitled to deference, because of the ALJ's unique opportunity to observe the claimant and judge her subjective complaints." *Buxton v. Halter*, 246 F.3d at 773; *accord White v. Commissioner*, 572 F.3d 272, 287 (6th Cir. 2009); *Casey v. Secretary of Health & Human Servs.*, 987 F.2d 1230, 1234 (6th Cir. 1993).

The ALJ found that plaintiff's testimony regarding the intensity, persistence, and limiting effects of her impairments was not fully credible. (Op. at 6-12, Page ID 41-47 ). The accusation

-7-

that the ALJ applied a "sit and squirm" test is often raised when the ALJ's opinion includes a statement regarding his or her personal observations.  *See Lucido v. Commissioner*, 109 F. App'x 715, 716 (6th Cir. 2004); *Harris v. Heckler*, 756 F.2d 431, 439 (6th Cir. 1985).  These challenges are almost never meritorious, and this is no exception.  Like any other trier of fact, the ALJ is allowed to rely on his or her personal observations of a witness as an aid to determining credibility.  The ALJ's ability to do so gives a unique perspective on the claimant's credibility and is a major reason for the deference accorded to the ALJ's findings.  It is well established that the ALJ cannot rely solely upon her observations at the hearing in resolving a claimant's subjective complaints.  *See Weaver v. Secretary of Health & Human Servs.*, 722 F.2d 310, 312 (6th Cir. 1983).  However, it is equally well established that an ALJ "may distrust a claimant's allegations of disabling symptomology if the subjective allegations, the ALJ's personal observations, and the objective medical evidence contradict each other." *Moon v. Sullivan*, 923 F.2d 1175, 1183 (6th Cir.1990); *see Lucido v. Commissioner*, 109 F. App'x at 716–17; *see also Morales v. Commissioner*, No. 1:13-cv-1478196, at * 4 (W.D. Mich. Mar. 31, 2015).

It was appropriate for the ALJ to take plaintiff's daily activities into account in making her credibility determination.  *See Cruse v. Commissioner*, 502 F.3d 532, 542 (6th Cir. 2007); *Blacha v. Secretary of Health & Human Servs.*, 927 F.2d 228, 232 (6th Cir. 1990); *see also Keeton v. Commissioner*, 583 F. App'x 515, 532-33 (6th Cir. 2014)  ("Although the ability to do household chores is not direct evidence of an ability to do gainful work, an ALJ may consider household and social activities engaged in by the claimant in evaluating a claimants assertions of pain or ailments.") (citations and quotations omitted).

The ALJ did not "play doctor" or "cherry pick" this administrative record.  Arguments that the ALJ mischaracterized or "cherry picked" the administrative record are frequently made and seldom successful, because "the same process can be described more neutrally as weighing the evidence." *White v. Commissioner*, 572 F.3d 272, 284 (6th Cir. 2009).  The narrow scope of judicial review of the Commissioner's final administrative decision does not include re-weighing evidence. *See Ulman v. Commissioner*, 693 F.3d 709, 713 (6th Cir. 2012); *Bass v. Mahon*, 499 F.3d 506, 509 (6th Cir. 2007).  Plaintiff is the one erroneously focusing on a fragment of the record in isolation rather than in context.  The purported instance of "cherry picking" appears in one sentence in a paragraph at the bottom of page 9 of the ALJ's opinion in which the ALJ considered the intensity of plaintiff's symptoms.  (*see* Plf. Brief at 14, Page ID 906).  The ALJ found it difficult to reconcile plaintiff's assertions that she experienced "8 out of 10" pain when she "never appeared in any distress at her visits" and she refused to take medication that might relieve her symptoms because there was a possibility that the medication might cause weight gain.[1]  (Op. at 9, Page ID 44) (citing Exhibit 22F at 16, Page ID 813).    On April 14, 2011, plaintiff reported to Physician's Assistant Greene that her neck pain was "8/10 in severity" and that it was "alleviated by rest[.]"  (Page ID 810).  Mr. Greene noted that during their discussion regarding available medications, plaintiff stated that she did not want to try Lyrica because she feared weight gain.  (*Id.*).  In light of plaintiff's "resistance" to trying Lyrica, Greene initiated a trial of Neurontin.  (Page ID 813).  The ALJ's observations were accurate and appropriate.  The ALJ did not "cherry pick" this administrative record.  Further, the ALJ did not base her factual finding regarding plaintiff's credibility on her own

---

[1]The ALJ went on to note in the same paragraph that plaintiff's records "indicate[d] that she reported her medications were effective."  (Op. at 9, Page ID 44).

lay medical opinion. *See Griffith v. Commissioner*, 582 F. App'x 555, 562 (6th Cir. 2014) ("As the ALJ properly reviewed and weighed the reports to make a legal determination that is supported by substantial evidence, the assertion that the ALJ was 'playing doctor' is unsupported."); *Cf. Simpson v. Commissioner*, 344 F. App'x 181, 194 (6th Cir. 2009).

I find no merit in plaintiff's arguments that the ALJ erred in her observations that the objective medical findings were minimal, that plaintiff had received minimal psychological treatment and no neuropsychiatric testing, that plaintiff's headache complaints had been rare. Under 20 C.F.R. section 404.1529(c)(2) the ALJ was required to consider the extent to which the objective evidence supported plaintiff's subjective complaints: "Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption. Objective medical evidence of this type is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work. We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled." 20 C.F.R. § 404.1529(c)(2). There was no evidence that plaintiff had "required any crisis intervention, inpatient hospitalizations, emergency room visits or any other increases in treatment." (Op. at 10, Page ID 45). The ALJ did not "play doctor" by noting that plaintiff had received minimal psychological treatment and no neuropsychiatric testing. The record undermined rather than supported the functional limitations that plaintiff claimed as a result of mental impairments. Plaintiff's claim that she suffered from frequent headaches was not well supported by the underlying treatment records.

It was appropriate for the ALJ to consider that the reason plaintiff stopped working was that she was laid off, not that the symptoms from her impairments were so severe that she had to stop working. *See, e.g.*, *Roland-Monk v. Commissioner*, No. 1-13-cv-754, 2015 WL 104897, at * 8 (S.D. Ohio Jan. 7, 2015); *Tewksbury v. Commissioner*, No. 1:13-cv-440, 2014 WL 4627097, at * 4 (W.D. Mich. Sept. 15, 2014); *Willingham-Johnson v. Commissioner*, No. 1:12 CV 2762, 2013 WL 2387703, at * 8 (N.D. Ohio May 30, 2013).  In addition, it was appropriate for the ALJ to draw an adverse inference regarding plaintiff's credibility from her application for and collection of unemployment benefits during the period she claims to have been disabled.  *See Workman v. Commissioner*, 105 F. App'x 794, 801 (6th Cir. 2004) ("Applications for unemployment and disability are inherently inconsistent."); *see also Loyacano v. Commissioner*, No. 1:13-cv-144, 2014 WL 1660072, at * 5 (W.D. Mich. Apr. 25, 2014) (collecting cases); *Smith v. Commissioner*, No. 1:12-cv-904, 2014 WL 197846, at * 16 (S.D. Ohio Jan. 15, 2014); *Barton v. Astrue*, No. 3:11-cv-1239, 2013 WL 6196297, at * 7 (M.D. Tenn. Nov. 27, 2013).

I find that the ALJ gave a more than adequate explanation why she found that plaintiff's testimony was not fully credible and that her factual finding regarding plaintiff's credibility is supported by more than substantial evidence.  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Heston v. Commissioner*, 245 F.3d at 534.  The ALJ's factual finding easily withstands scrutiny under the deferential standard of review.

## 2.

Plaintiff argues that the ALJ violated the treating physician rule in the weight she gave to the opinions expressed by Psychologist Diane Denman, and Ruth Walkotten, D.O.  (Plf. Brief at 14-19,

Page ID 906-11; Reply Brief at 4-5, Page ID 1000-01).  The issue of whether the claimant is disabled within the meaning of the Social Security Act is reserved to the Commissioner.  20 C.F.R. § 404.1527(d)(1); *see Warner v. Commissioner*, 375 F.3d 387, 390 (6th Cir. 2004).  A treating physician's opinion that a patient is disabled is not entitled to any special significance.  *See* 20 C.F.R. §§ 404.1527(d)(1), (3); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007); *Sims v. Commissioner*, 406 F. App'x 977, 980 n.1 (6th Cir. 2011) ("[T]he determination of disability [is] the prerogative of the Commissioner, not the treating physician.").  Likewise, "no special significance" is attached to treating physician opinions regarding the credibility of the plaintiff's subjective complaints, RFC, or whether the plaintiff's impairments meet or equal the requirements of a listed impairment because they are administrative issues reserved to the Commissioner.[2]  20 C.F.R. §§ 404.1527(d)(2), (3); *see Allen v. Commissioner*, 561 F.3d 646, 652 (6th Cir. 2009).

Generally, the medical opinions of treating physicians are given substantial, if not controlling, deference.  *See Johnson v. Commissioner*, 652 F.3d 646, 651 (6th Cir. 2011).  "[T]he opinion of a treating physician does not receive controlling weight merely by virtue of the fact that it is from a treating physician.  Rather, it is accorded controlling weight where it is 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and is not 'inconsistent . . . with the other substantial evidence in the case record.'"  *Massey v. Commissioner*, 409 F. App'x 917, 921 (6th Cir. 2011) (quoting *Blakley v. Commissioner*, 581 F.3d 399, 406 (6th Cir. 2009)).  A treating physician's opinion is not entitled to controlling weight where it is not "well-supported by

---

[2]"We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section."  20 C.F.R. § 404.1527(d)(3); *see Blankenship v. Commissioner*, No. 14-2464, __ F. App'x __, 2015 WL 5040223, at * 9 (6th Cir. Aug. 6, 2015).

-12-

medically acceptable clinical and laboratory diagnostic techniques" or is "inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see Gayheart v. Commissioner*, 710 F.3d 365, 376 (6th Cir. 2013) (A treating physician's medical opinion is entitled to controlling weight where "two conditions are met: (1) the opinion 'is well supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" (citing 20 C.F.R. § 404.1527(c)(2)). The ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001). An opinion that is based on the claimant's reporting of her symptoms is not entitled to controlling weight. *See Young v. Secretary of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990); *see also Francis v. Commissioner*, 414 F. App'x 802, 804 (6th Cir. 2011) (A physician's statement that merely regurgitates a claimant's self-described symptoms "is not a medical opinion at all.").

Even when a treating source's medical opinion is not given controlling weight because it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the record, the opinion should not necessarily be completely rejected; the weight to be given to the opinion is determined by a set of factors, including treatment relationship, supportability, consistency, specialization, and other factors. *See Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions*, SSR 96-2p (reprinted at 1996 WL 374188 (SSA July 2, 1996)); 20 C.F.R. §§ 404.1527(c); *Martin v. Commissioner*, 170 F. App'x 369, 372 (6th Cir. 2006).

-13-

The Sixth Circuit has held that claimants are "entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Commissioner*, 482 F.3d 873, 875-76 (6th Cir. 2007); *see Cole v. Astrue*, 661 F.3d 931, 937-38 (6th Cir. 2011); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004).  "[T]he procedural requirement exists, in part, for claimants to understand why the administrative bureaucracy deems them not disabled when physicians are telling them that they are."  *Smith*, 482 F.3d at 876; *see Gayheart v. Commissioner*, 710 F.3d at 376.

Plaintiff claimed an August 14, 2009, onset of disability.  She testified that she was laid off from her job in August 2009, and that from the date she was laid off through the date of her administrative hearing (November 14, 2011), she continued to receive unemployment benefits. (Page ID 63-64, 77).

A.    Psychologist Denman

Plaintiff did not have any history of hospitalization for mental impairments. Her primary care physician, Edwin Kornoelje, D.O., had prescribed medication for depression and anxiety.  The ALJ was accurate when she observed that there had been "minimal mention of any psychiatric problems at [plaintiff's] treating provider visits, and other than medication prescribed by her primary care physician, she received no psychiatric treatment after October 2010."  (Op. at 10, Page ID 45).

-14-

On November 19, 2009, Psychologist Diane Denman performed an intake assessment.[3] (Page ID 355-61).  Plaintiff related that she had been laid off in August 2009 and was collecting unemployment.  (Page ID 356).  Denman offered a diagnosis of an adjustment disorder with depressed mood.  (Page ID 361).  Her treatment goals were to educate plaintiff regarding living with chronic disease and to help her make a decision regarding working or not working.  (Page ID 362). There are no progress notes from Psychologist Denman for the period between plaintiff's alleged onset of disability through the date of the ALJ's decision, with the exception of a progress note dated October 18, 2010.  During that visit, plaintiff stated that she was taking college courses online and was getting her BA in communications, but felt that she could not work.  (Page ID 877-88).

On June 28, 2010, Psychologist Cynthia Raven performed a consultative examination.  (Page ID 741-45).  Plaintiff related that she had been diagnosed with chronic fatigue syndrome in 2007. She had no history of inpatient psychiatric treatment.  (Page ID 741).  Plaintiff reported that she had graduated from high school and had her B.A. in English from Michigan State University.  She was working on a communications degree through Walden University online.  Plaintiff lived by herself in a condominium and was receiving unemployment compensation.  (Page ID 742).  Plaintiff was able to drive herself to this appointment and arrived early.  She was alert, oriented and spontaneous.

---

[3]Plaintiff had seen Psychologist Denman for a brief series of therapy sessions in 2007 and 2008.  On March 26, 2007, Denman conducted an intake assessment and had offered a diagnosis of an adjustment disorder with depressed mood.  (Page ID 380-86, 401).  Plaintiff complained of stress related to her job at AT&T.  (Page ID 380).  The goals of Denman's treatment plan were to decrease plaintiff's depression and to reduce her ambivalence toward her job by helping her decide if she wanted her job at AT&T.  (Page ID 387).  The record contains a few progress notes from April 2007. (Page ID 375-78).  Plaintiff returned to Denman April 2008, disclosed an assault by a co-worker, and related that she "want[ed] to get out of AT&T."  (Page ID 366).  Denman offered a diagnosis of an acute stress reaction, gave plaintiff a GAF score of 55, and indicated that her highest GAF in the past year was 75.  (Page ID 373).  Plaintiff's last visit occurred on June 19, 2008.  (Page ID 365, 409).  She was discharged as a patient on July 31, 2008.  (Page ID 363).

her speech was clear, coherent, and fluent.  No unusual mental activity was noted.  Plaintiff was somatically preoccupied with fatigue, chronic pain, and sleep disturbances.  (Page ID 743).  Psychologist Raven gave a diagnosis of major depressive disorder, recurrent, moderate and an anxiety disorder, NOS.  (Page ID 745).

Plaintiff had no psychiatric treatment after October 2010.  (Op. at 10, Page ID 45).  Almost a year later, on September 20, 2011, Psychologist Denman signed a RFC questionnaire.  (Page ID 791-96).  She indicated that she had last seen plaintiff on October 18, 2010.  (Page ID 791; *see* Page ID 877-78).  She offered a diagnosis of pain disorder.  (Page ID 791).  Denman's responses to every question on the RFC questionnaire regarding plaintiff ability to perform work activities were either that plaintiff had "no useful ability to function" or was "unable to meet competitive standards." (Page ID 794- 95).  In addition, she asserted that plaintiff's impairments would cause her to be absent from work "more than four days a month."  (Page ID 796).  The ALJ found that the extreme restrictions suggested by Psychologist Denman were not well supported by objective medical evidence and were inconsistent with the record as a whole:

> In September 2011 claimant's psychologist, Diane Denman, Ph.D. opined claimant had numerous symptoms and inability to meet competitive standards in essentially all areas of mental functioning (Exhibit 21F).  This opinion is given little weight (20 CFR 404.1527).  Dr. Denman has not seen claimant for almost a year at the time of this opinion (Exhibit 21F and 25F).  Moreover, Dr. Denman's opinion is inconsistent with the claimant's ability to live alone, attend online college course, drive, attend church once per month, maintain friendships, shop, cook, and care for her own personal needs.  Moreover, the opinion is inconsistent with the objective medical evidence, which documents little, and conservative treatment for her psychiatric problems.  Furthermore, this opinion is in stark contrast to her presentation at the hearing and her presentation at the consultative examination.  At the consultative examination, claimant was able to name large cities, name famous people, and interpret proverbs (Exhibit 13F).  Moreover, subsequent examinations noted that the claimant had a normal mood and affect, and normal concentration (Exhibit 19F).

-16-

(Op. at 12, Page ID 47).  The restrictions Psychologist Denman suggested were not supported by objective evidence and were inconsistent with the record as a whole.  In addition, her predictions of how often plaintiff would likely have been absent if she had been working were conjecture, not medical opinions.  *See Murray v. Commissioner*, 1:10-cv-297, 2011 WL 4346473, at * 7 (W.D. Mich. Aug. 25, 2011) (collecting cases).  Further, the issues of disability and RFC are reserved to the Commissioner.  *See* 20 C.F.R. § 404.1527(d)(3); *see Allen v. Commissioner*, 561 F.3d at 652. Here, the ALJ gave a more than adequate explanation of her consideration of the RFC questionnaire. Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Heston v. Commissioner*, 245 F.3d at 534.  The ALJ's factual finding that plaintiff retained the RFC for a limited range of light work which involved understanding, remembering, and performing simple instructions, making simple work-related decisions, and interacting with coworkers, supervisors and the public (Op. at 6, Page ID 41) is supported by more than substantial evidence.  I find no basis for disturbing the Commissioner's decision.

### B.    Dr. Walkotten

Plaintiff claimed an August 14, 2009, onset of disability.  Her medical history included a 2004 cervical fusion at C5-6.  (Page ID 398).  Approximately six weeks before her alleged onset of disability, plaintiff began seeing Linda K Hegstrand, M.D., at the "Complete Wellness Center." (Page ID 682).  Hegstrand indicated that the methods that she used to evaluate her patients were "not those generally used in conventional western medicine."  (Page ID 675).  She recommended that plaintiff "receive disability from social security."  (*Id.*).  Further, before her alleged onset of

-17-

disability, plaintiff had received treatment in 2008 and 2009 at West Michigan Heart for problems with varicose veins.  (Page ID 321-46).

Plaintiff's primary care physician before and during the period at issue was Dr. Kornoelje. (Page ID 398, 411).  On February 23, 2009, plaintiff complained of neck pain and stiffness and asked Kornoelje for a prescription for Pilates as physical therapy.  (Page ID 444).  Plaintiff had no chronic headaches, no numbness or tingling, or tremors, or seizures.  (Page ID 445).  Kornoelje gave plaintiff a prescription for Flexeril (Page ID 445) and made the requested recommendation regarding Pilates: "Bridget would benefit from Pilates for her chronic neck pain/plate in neck.  She would benefit from private sessions."  (Page ID 446).  On June 22, 2009, plaintiff complained of fatigue and problems falling asleep.  She wondered if she had chronic fatigue.  (Page ID 432).  Dr. Kornoelje indicated that plaintiff had no unexpected change in weight, no weakness, and "no fatigue." (Page ID 433).  Plaintiff was well developed, well nourished, and in no apparent distress. Dr. Kornoelje prescribed Sertraline for depression and referred plaintiff to endocrinology to address her fatigue complaints.  (Page ID 433).

On January 18, 2010, plaintiff returned to Dr. Kornoelje.  Plaintiff reported pain in her neck, hands and feet and sought a referral to a rheumatologist and a genetic counselor.  (Page ID 698). Plaintiff's gait was normal.  Her deep tendon reflexes were normal and symmetric.  She was alert and oriented to person, place and time.  Her extremities showed no clubbing, cyanosis, or edema. There was "some joint hypermobility."  Dr. Kornoelje approved both requests for referrals.  (Page ID 419, 699).

On February 2, 2010, plaintiff sought an evaluation of her head, neck, and chest pains by Roya Vakill, M.D.  (Page ID 694).  Plaintiff's extremities had no clubbing, cyanosis or peripheral

-18-

edema.  She had no exercise intolerance, no shortness of breath, no palpations, and no syncope. (Page ID 696).  Plaintiff's appearance was normal for her age.  She was alert and oriented.  Her attention and concentration were normal.  Her strength was 5/5 in all areas tested.  (*Id.*).  Her gait was normal.  (Page ID 697).  Dr. Vakill referred plaintiff to a cardiologist for further investigation of her complaints of chest pain.  (*Id.*).

On March 1, 2010, plaintiff appeared at West Michigan Rheumatology for a new patient evaluation performed by Aaron Eggebeen, M.D.  (Page ID 657-60).  Dr. Eggebeen found that plaintiff's strength was 5/5 and her deep tendon reflexes were 2+ and symmetrical.  (Page ID 659).  He concluded that it was unlikely that all the symptoms that plaintiff reported were caused by an autoimmune connective tissue disease.  Plaintiff's symptoms were noninflammatory.  He had no explanatory cause for plaintiff's chronic fatigue.  He found some evidence of joint hypermobility. (Page ID 659).

On March 6, 2010, plaintiff was examined by Erik Hedlund, D.O., at Spectrum Health on a referral from Dr. Kornoelje.  (Page ID 667-73).  Plaintiff had a normal active range of motion and normal strength.  She was alert, cooperative, and in no distress.  (Page ID 671).  Dr. Hedlund found some evidence of joint laxity.  (Page ID 671).  X rays of plaintiff's cervical spine showed normal alignment.  Vertebral body height, disc height and posterior elements were all within normal limits. There was no evidence of fracture, subluxation or bony destructive process.  X-rays showed the internal fixation at C5-6, but there was no evidence of hardware complication.  Plaintiff's paravertebral soft tissues were normal.  (Page ID 672-73).  Dr. Hedlund recommended that plaintiff continue with existing conservative treatment.  (Page ID 671).

On March 11, 2010, plaintiff was examined by Keith Javery, D.O., at the Javery Pain Institute, P.C. (Page ID 703-707). Plaintiff complained of pain in her neck localized to the posterior cervical region. She also reported intermittent moderate to severe headaches. (Page ID 703). Plaintiff was described as well-nourished, well developed, alert, [and] in no acute distress." (Page ID 705). She had normal muscle strength and tone. (Page ID 706). Her joint stability was within normal limits. (Page ID 705-06). Dr. Javery performed an occipital nerve block and plaintiff reported that her pain was "0/10 at discharge." (Page ID 707-08). Javery administered nerve blocks on April 23, June 18, and November 18, 2010 (Page ID 818, 822, 826), and initiated a trial of low dose dopamine on January 31, 2011. (Page ID 817).

On March 22, 2010, Jihad Mustapha, M.D., examined plaintiff on a referral from Dr. Vakill. (Page ID 711-20). Plaintiff described her chest pain as intermittent. (Page ID 711). Dr. Mustapha found that plaintiff's extremities showed "no clubbing, no cyanosis and no pain, redness or swelling of the joints." (Page ID 712). Neurologically he found that plaintiff had no chronic headaches, no numbness, tingling or tremor, no seizures, [and] no weaknesses." (*Id.*). Plaintiff displayed no anxiety, no depression, and no psychosis. (*Id.*). Plaintiff was not in any acute distress. Her gait was unremarkable and her muscular strength appeared normal. Plaintiff's electrocardiogram was normal. Her exercise stress test was negative for myocardial ischemia. (Page ID 712-16).

On May 4, 2010, plaintiff met with a genetic counselor at Spectrum Health on a referral from Dr. Kornoelje. (Page ID 762-64). On examination, plaintiff displayed the hypermobility of her elbows and knees. The counselor recommend that plaintiff participate in physical therapy and discuss the option of braces with an orthopedist and physical therapist and continue seeing Dr. Javery for her pain. (Page ID 763-64).

-20-

On July 1, 2010, Michael Jacobson, D.O., performed a consultative examination. (Page ID 747-50). Dr. Jacobson noted that plaintiff did not require an assistive walking device and that she denied any injuries or surgeries other than her cervical fusion in 2003. (Page ID 747). He observed that plaintiff completed high school and four years of college. She is right-hand dominant and can read and write. Her weight was 146 pounds and she was 65.5" tall. She had a full range of motion and her grip strength was normal. (Page ID 748). There was "no tenderness, erythema, or effusion of any joint." (Page ID 748). Neurologically, plaintiff's motor and sensory function remained intact. Her reflexes were present and symmetrical. Her fine motor skills were intact and she retained full dexterity. (Page ID 748-50).

Plaintiff received treatment at the Javery Pain Institute provided by Physician's Assistant Aaron Greene on April 14, May 27, July 20, and October 13, 2011. Plaintiff's range of motion was normal. Her joint stability was normal. Her strength was normal. (Page ID 798-813).

On July 28, 2011, Dr. Vakill noted that plaintiff's gait was normal and her appearance was normal for her age. She was oriented as to time, place and person. Her attention and concentration were normal. (Page ID 781). Her strength was 5/5 in all areas tested. (Page ID 781). Her gait was normal. (Page ID 782).

It was against the record summarized above that the ALJ considered the opinions offered by Dr. Walkotten. The ALJ noted that plaintiff did not seek treatment from Dr. Walkotten until March 2010. (Op. at 8, Page ID 43). On March 29, 2010, plaintiff traveled from her home in Kentwood and left the Grand Rapids area to become a new patient at the Walkotten Wellness Center located in North Muskegon, Michigan. (Page ID 734-38). Plaintiff returned to Muskegon on April 14, 2010, for a social security disability physical examination. (Page ID 732). During the "disability

-21-

determination evaluation," Dr. Walkotten recorded plaintiff's subjective complaints.  (Page ID 732-

34, 738).  The objective evidence was limited to recording that plaintiff was 5'5" tall, weighed 142

pounds, her blood pressure was 120/78, her pulse was 60 and her respirations were "12."  (Page ID

736).  There are no progress notes documenting treatment provided by Dr. Walkotten.[4]  The closest

she came was having a conversation with plaintiff in which plaintiff stated that she would resume

taking Zoloft.  (Page ID 738).

 In August 2010, Walkotten offered her opinions that plaintiff had extreme functional

limitations and was totally disabled.[5]  (Page ID 768-72).  The ALJ found that the RFC restrictions

that Dr. Walkotten suggested were based on plaintiff's subjective complaints rather than objective

evidence:

> In August 2010, Dr. Walkotten submitted a form that purports to be an assessment of the
> claimant's physical abilities; however, it is essentially a recitation of the claimant's alleged
> symptoms (Exhibit 17F).  For Social Security purposes, an impairment must be established,
> not only by a claimant's statement of symptoms, but by medical evidence consisting of signs,
> symptoms, and laboratory findings (20 CFR 404.1508).  Although claimant has some
> functional limitations associated with her physical impairments, the weight of evidence of
> record does not establish claimant is unable to work, or even limited to sedentary exertion.
> The form signed by Dr. Walkotten is not consistent with the claimant's minimal objective
> clinical findings or her ability to live alone, attend online college courses, care for herself,
> drive, shop, or handle her own finances.  Thus, to the extent that this form is intended to be
> a medical opinion, it is given no weight (20 CFR 404.1527).

_____

[4]On the present record, it would not have been error if the ALJ had treated Dr. Walkotten's
opinions as those of a consultative examiner rather than a treating physician.  *See Kornecky v.
Commissioner*, 167 F. App'x 496, 507 (6th Cir. 2006) ("[D]epending on the circumstances and the
nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment
relationship.").

[5]Walkotten's letter contains a passing reference to her "disability evaluation," but
erroneously indicates that the disability evaluation "was done on 4-4-10" rather than April 14, 2010.
(Page ID 768).

(Op. at 11, Page ID 46).  I find no violation of the treating physician rule.  The extreme RFC restrictions that Dr. Walkotten suggested were not well supported by objective evidence and were inconsistent with the record as a whole.  The ALJ gave good reasons for rejecting Dr. Walkotten's opinions.

## **Recommended Disposition**

For the reasons set forth herein, I recommend that the Commissioner's decision be affirmed.


Dated:   September 1, 2015        /s/  Phillip J. Green                
United States Magistrate Judge

## **NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file timely and specific objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 458 (6th Cir. 2012); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir. 2008).  General objections do not suffice.  *See McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).